UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Dennis G. Huckins</u>


        v.                          Civil No. 11-cv-106-JD
                                    Opinion No. 2012 DNH 137

<u>Mark McSweeney and</u>
<u>Town of Sanbornton</u>


O R D E R

        Dennis Huckins sued Officer Mark McSweeney and the Town of
Sanbornton, New Hampshire, alleging a violation of his Fourth
Amendment rights under 42 U.S.C. § 1983 against McSweeney, a
claim for battery against both defendants, and a claim for
malicious prosecution against Sanbornton.  The defendants move
for summary judgment.  Huckins objects.


Background

        On the evening of January 20, 2009, Dennis Huckins and his
friend, Gregory Gagnon,[1] were driving in Sanbornton, New
Hampshire on their way to go snowmobiling.  Huckins and Gagnon
each drove his own truck, with Huckins following Gagnon.
Gagnon's truck was towing the snowmobiles.

────────────────

        [1]Gagnon's wife, Denise, was also present on the trip.

While driving on New Hampton Road, Officer Mark McSweeney observed that the taillights on the trailer that Gagnon was towing were not working.  He pulled Gagnon over to the side of the road to conduct a routine traffic stop.  Huckins, seeing that Gagnon had been stopped by a police officer, also pulled over, stopping about one hundred and fifty feet behind McSweeney's police cruiser.

Gagnon told McSweeney that Huckins was following him on their trip.  McSweeney walked back to Huckins's truck and asked Huckins to pull in front of Gagnon's truck.  Huckins said that he would.  McSweeney noticed that Huckins eyes were glassy, but did not ask him any questions.  After speaking with Huckins, McSweeney returned to his police cruiser.

Huckins pulled his truck out in front of Gagnon's truck as McSweeney had directed him to do.  He then got out of his truck and walked back to Gagnon.  Gagnon and Huckins decided that Huckins would drive ahead to the General Store and fill up some gas cans for the snowmobile trip.  Huckins took the gas cans from Gagnon's truck, returned to his truck, and drove to the General Store.

McSweeney eventually returned to Gagnon's truck and noticed that Huckins was no longer at the scene.  He asked Gagnon where Huckins had gone.  Gagnon told him that Huckins had driven ahead

to the General Store to get gasoline.  McSweeney gave Gagnon a
warning for the broken taillights, and Gagnon drove off to meet
Huckins at the General Store.

Shortly after Gagnon arrived at the store, McSweeney arrived
as well.  McSweeney approached Huckins and Gagnon, both of whom
were already out of their trucks.  McSweeney asked Huckins if he
could speak with him.  Huckins agreed and they walked to
McSweeney's police cruiser.

McSweeney asked Huckins whether he had consumed alcohol that
day.  Huckins said that he had not and that he did not ever drink
alcohol.  McSweeney again noticed that Huckins's eyes were glassy
and asked Huckins if he could conduct a field sobriety test.
Huckins consented.  McSweeney's report noted that at this time,
"Huckins appeared nervous and worried and was making poor eye
contact."

Before performing the field sobriety test, McSweeney went
over to Huckins's truck to record his license plate and radio it
to dispatch.  While at the truck, McSweeney noticed that Huckins
was speaking to someone on his cell phone.  McSweeney's police
report noted that "Huckins was pacing and had his head down
appearing anxious."

McSweeney then walked over to Gagnon and told him that he
had noticed at the initial traffic stop that Huckins's eyes were

glassy.  McSweeney asked Gagnon if he knew whether Huckins had consumed alcohol that day.  Gagnon told McSweeney that he did not think Huckins had consumed any alcohol that day and that he had not consumed any since the two had gotten together earlier that evening.  McSweeney thanked Gagnon and returned to Huckins.

McSweeney began conducting a horizontal gaze nystagmus ("HGN") test on Huckins.  The HGN test involved Huckins following a pen with his eyes without moving his head.  McSweeney performed the exercise multiple times, but Huckins was unable to follow McSweeney's directions.

Huckins alleges that McSweeney was "rude and condescending," and that after numerous attempts at the HGN test, Huckins began to walk away toward his truck.  McSweeney put his hand on Huckins's arm and told him that he was not free to leave.  Huckins ignored McSweeney and began walking toward his truck.  McSweeney started following him, and Huckins began running.  McSweeney yelled for Huckins to stop, but Huckins continued to run.  As Huckins passed Gagnon, Gagnon asked Huckins why he was running.  Huckins did not answer.

As Huckins neared his truck, McSweeney fired his taser toward Huckins.  The taser prongs struck Huckins in the back and he fell to the ground, injuring his right elbow.  Gagnon contends that he saw McSweeney deploy the taser again when Huckins tried

4

to get on his hands and knees.  Huckins was subsequently placed
under arrest and taken to the police station.

### Standard of Review

Summary judgment is appropriate if the moving party "shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A party opposing summary judgment "must set forth
specific facts showing that there is a genuine issue for trial."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).
Material facts are "facts that might affect the outcome of the
suit under the governing law."  Id. at 248.  The court considers
the undisputed material facts and all reasonable inferences from
those facts in the light most favorable to the nonmoving party.
Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011).

### Discussion

Huckins brings a federal claim under § 1983, alleging that
McSweeney unreasonably detained him and used excessive force
against him, violating his rights under the Fourth Amendment.  He
also brings a state law claim of battery against McSweeney.
Huckins brings a state law claim against Sanbornton, alleging
liability for McSweeney's battery under a theory of *respondeat*

*superior*, and a claim for malicious prosecution arising from the charge of resisting arrest.  The defendants moves for summary judgment on all of Huckins's claims.


A.    Section 1983

    Huckins's claim under § 1983 is based on allegations that McSweeney violated Huckins's Fourth Amendment rights by unlawfully detaining him and by using excessive force.  McSweeney contends that no Fourth Amendment violation occurred and that he is entitled to qualified immunity.


    1.    Unreasonable Detention

    McSweeney argues that his detention of Huckins did not violate the Fourth Amendment because he had reasonable suspicion to detain Huckins.  As discussed below, McSweeney is entitled to qualified immunity on Huckins's unreasonable detention claim. Therefore, the court will not address whether Huckins's unreasonable detention claim would have otherwise survived McSweeney's motion for summary judgment.


    2.    Excessive Force

    "To establish a Fourth Amendment excessive force claim, a plaintiff must show that the defendant employed force that was

unreasonable under all the circumstances."  Morelli v. Webster,
552 F.3d 12, 23 (1st Cir. 2009).  In considering whether a
defendant's use of force was reasonable, the court may consider
"the severity of the crime at issue, whether the suspect poses an
immediate threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to evade
arrest by flight."  Graham v. Connor, 490 U.S. 386, 396 (1989).

     Viewing the record evidence in the light most favorable to
Huckins, a factual dispute precludes summary judgment on
Huckins's excessive force claim.  Whether or not the initial use
of a taser was excessive force, Gagnon's police statement and
sworn affidavit state that he saw McSweeney deploy the taser a
second time while Huckins was on the ground.  Given that the
suspected crime was driving under the influence, that Huckins
could not have posed an immediate threat to the safety of others
while being on the ground after McSweeney's initial use of the
taser, and that Huckins was not trying to resist arrest at that
moment, a rational jury could find that a second use of the taser
was excessive force.

     McSweeney argues that Huckins testified at his deposition
that he felt the taser only once.  Specifically, Huckins answered
"yes" to the question of whether the taser felt like one long
electric shock.  Huckins's response, however, is not an admission

that McSweeney fired the taser only once.  His answer merely
agrees with a description of what he felt.  Gagnon's police
statement and affidavit are evidence that McSweeney fired the
taser twice.  Therefore, a material factual dispute exists
because if McSweeney fired the taser twice, a rational jury could
find that he used excessive force.

      3.   <u>Qualified Immunity</u>

     McSweeney contends that he is entitled to qualified immunity
on Huckins's claim that he was unreasonably detained and that
McSweeney used excessive force in violation of the Fourth
Amendment.  McSweeney argues that a reasonable officer in his
position could have believed he had reasonable suspicion to
detain Huckins and that his use of a taser was justified and not
excessive.

     Qualified immunity shields officers from "liability for
civil damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known."  <u>Estrada v. Rhode Island</u>,
594 F.3d 56, 62 (1st Cir. 2010) (internal quotation marks and
citations omitted).  "[T]he qualified immunity inquiry is a two-
part test.  A court must decide: (1) whether the facts alleged or
shown by the plaintiff make out a violation of a constitutional

8

right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." Air Sunshine, Inc. v. Carl, 663 F.3d 27, 32-33 (1st Cir. 2011) (internal quotation marks and citations omitted).  Determining whether a right was clearly established involves two parts:  establishing that the right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right," and, focusing on the particular facts of the case, that "a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (internal quotation marks and citation omitted).

To properly apply the summary judgment standard to a defense of qualified immunity, a court must proceed by "first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Morelli, 552 F.3d at 19.  "[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question" of whether a constitutional violation occurred. Reichle v. Howards, 132 S. Ct. 2088, 2012 WL 1969351, at *4 (June 4, 2012); see also Eldredge v. Town of

9

Falmouth, MA, 662 F.3d 100, 106 (1st Cir. 2011); Maldonado, 568
F.3d at 269-70.

        a.   Unreasonable Detention

     "A detention at the hands of a police officer constitutes a
seizure of the detainee's person and, thus, must be adequately
justified under the Fourth Amendment."  Morelli, 552 F.3d at 19;
see also Terry v. Ohio, 392 U.S. 1, 19 (1968).  A police officer
may briefly detain an individual for questioning, such as during
an investigatory stop, if the officer has "reasonable suspicion
to believe that criminal activity 'may be afoot.'" United States
v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v.
Sokolow, 490 U.S. 1, 7 (1989)); see also United States v. Zapata,
18 F.3d 971, 975 (1st Cir. 1994).

     Where, as here, a seizure is challenged on the ground that
the officers lacked reasonable suspicion, the "relevant inquiry
for qualified immunity purposes is not whether reasonable
suspicion to conduct the stop in fact existed, but whether a
reasonable officer could have believed that it did."  Eldredge,
662 F.3d at 106.  Therefore, a defendant is protected by
qualified immunity "'so long as the presence of [reasonable
suspicion] is at least arguable.'"  Id. (quoting McInnis v.
Maine, 638 F.3d 18, 22 (1st Cir. 2011)).

Here, Huckins admits that up until the time he tried to walk away from McSweeney, he consented to questioning and sobriety testing.  He contends, however, that McSweeney lacked reasonable suspicion to detain him after he started to walk away.  McSweeney contends that he had reasonable suspicion to support continued detention.

In support, McSweeney asserts that he had reasonable suspicion that Huckins had been driving under the influence because: (1) Huckins had glassy eyes when McSweeney first spoke to him; (2) Huckins agreed to pull his car in front of Gagnon's car during the traffic stop, briefly did so, and then drove away to the General Store before the traffic stop was completed; (3) Huckins was unable to follow McSweeney's directions during the HGN test; and (4) Huckins was acting nervous during his discussion with McSweeney at the General Store.  Huckins does not dispute the circumstances that McSweeney cites.

Huckins's glassy eyes, failure to stay at the traffic stop, inability to follow the HGN test, and nervousness could have given a reasonable officer a reasonable suspicion that Huckins was intoxicated.  See, e.g., United States v. Caine, 517 F. Supp. 2d 586, 589 (D. Mass. 2007) ("Although bloodshot and glassy eyes could be the result of a number of innocent causes, it was equally reasonable to suspect that Defendant's condition was

11

caused by alcohol consumption . . . ."); <u>see also</u> <u>United States</u>
<u>v. Bohanon</u>, 629 F. Supp. 2d 802, 820 (E.D. Tenn. 2009) (although
it is not particularly relevant, "nervousness may be considered
as part of the overall circumstances giving rise to a reasonable
suspicion"); <u>United States v. Hernandez-Gomez</u>, 2008 WL 1837255,
at *7 (D. Nev. Apr. 22, 2008) ("the results of properly conducted
standard field sobriety tests may be considered to determine
whether probable cause exists to charge a driver with driving
while intoxicated").

     Huckins argues that there were numerous other factors
mitigating any reasonable suspicion, including Gagnon's statement
to McSweeney that Huckins was not intoxicated, the lack of an
odor of alcohol on Huckins's breath, the fact that Huckins was
not slurring his words or having difficultly walking, and
Huckins's explanation to McSweeney that his eyes were glassy
because he worked as a logger.  The court, however, need not
"determine whether each of the facts supporting reasonable
suspicion are susceptible to an innocent explanation."  <u>United</u>
<u>States v. Wright</u>, 582 F.3d 199, 205 (1st Cir. 2009) (internal
quotation marks and citation omitted).  Thus, "[a] determination
that reasonable suspicion exists need not rule out the
possibility of innocent conduct."  <u>Arvizu</u>, 534 U.S. at 277.  Even
accepting the facts as Huckins presents them, "the[se]

circumstances simply are not clear-cut enough . . . to preclude a reasonable belief that a crime was being committed." Morelli, 552 F.3d at 20; see also New Jersey v. T.L.O., 469 U.S. 325, 346 (1985) ("the requirement of reasonable suspicion is not a requirement of absolute certainty; sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment") (internal quotation marks omitted).

Huckins also argues that the Sanbornton police department's "Use of Force Report" demonstrates that McSweeney had concluded that Huckins was not intoxicated at the time of the seizure, obviating reasonable suspicion to detain him.  The report states that although Huckins was not "appearing" to be intoxicated, McSweeney "wanted to finish the entire HGN test to ensure [his] judgment" because Huckins could not follow McSweeney's directions.  In other words, the report states that Huckins did not appear to be intoxicated but that his inability to complete the HGN test suggested otherwise.  Therefore, a reasonable officer could have had reasonable suspicion to detain Huckins to resolve the ambiguities as to whether or not he was impaired.

Because a reasonable officer in McSweeney's position could have had reasonable suspicion warranting further investigation, the court need not decide whether McSweeney's detention of Huckins amounted to a constitutional violation.  McSweeney is

entitled to qualified immunity to the extent that Huckins's
Fourth Amendment claim is based on unreasonable detention.[2]

      b.  <u>Excessive force</u>

The merits of Huckins's excessive force claim are discussed
above, and the facts taken in the light most favorable to Huckins
support his claim.

For purposes of the second step of the analysis, whether the
asserted constitutional right was clearly established, McSweeney
was on notice of the Fourth Amendment right Huckins asserts
because the First Circuit's "case law supplies a crystal clear
articulation of the right, grounded in the Fourth Amendment, to
be free from the use of excessive force by an arresting officer."
<u>Morelli</u>, 552 F.3d at 23; <u>see also</u> <u>Cortés-Reyes v. Salas-Quintana</u>,
608 F.3d 41, 52 (1st Cir. 2010) ("[t]he law is clearly
established if courts have ruled that materially similar conduct
was unconstitutional, or if there is a previously identified
general constitutional principle that applied with obvious
clarity to the specific conduct at issue") (internal quotation

---

[2]In their motion, the defendants contend that probable cause
existed to arrest Huckins.  Huckins does not assert a separate
Fourth Amendment claim based on an unlawful or unreasonable
arrest.  Therefore, the court will not address the defendants'
arguments on that point.

14

marks and citation omitted).  The next question is whether McSweeney's "use of excessive force constituted the type and kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made."  <u>Morelli</u>, 552 F.3d at 24.

No reasonable police officer could have believed that the encounter with Huckins justified firing the taser a second time while Huckins was on the ground.  <u>See, e.g.</u>, <u>Williams v. City of White Plains</u>, 718 F. Supp. 2d 374, 379 (S.D.N.Y. 2010) (the record evidence viewed in the light most favorable to the plaintiff, showing that he was shocked by an officer's taser twice, the second time being when he was already on the ground, "describe[s] a constitutionally unreasonable use of force in restraining [the plaintiff]").  McSweeney does not contend that a reasonable officer would have felt justified in firing the taser twice.  He argues only that Huckins's deposition testimony conclusively establishes that he fired the taser only once.  As discussed above, however, when viewed in the light most favorable to Huckins, his testimony does not establish that McSweeney fired the taser only once.

Accordingly, McSweeney is not entitled to qualified immunity on Huckins's Fourth Amendment claim based on McSweeney's use of excessive force.

B.   Battery

Huckins alleges that McSweeney's use of the taser
constitutes battery under New Hampshire law.  He also contends
that Sanbornton is liable under the doctrine of *respondeat
superior*.  The defendants seek summary judgment, arguing that no
battery occurred.  Sanbornton also argues that even if McSweeney
did commit a battery against Huckins, it is immune from liability
for McSweeney's battery.

1.   Claim against McSweeney

McSweeney argues that he is entitled to summary judgment on
Huckins's claim for battery because New Hampshire Revised
Statutes Annotated ("RSA") 627:5 authorizes a police officer to
use non-deadly force that he reasonably believes is necessary to
effect an arrest or detention in most circumstances.  Huckins
contends that McSweeney could not have reasonably believed it was
necessary to deploy the taser even once, let alone twice.

The parties agree that the standard under RSA 627:5 is the
same as the Fourth Amendment standard for excessive force.
Because McSweeney is not entitled to summary judgment as to
Huckins's Fourth Amendment claim based on excessive force, he is
similarly not entitled to summary judgment as to Huckins's claim
for battery based on the same conduct.  See Mlodzinski v. Lewis,

16

648 F.3d 24, 39-40 (1st Cir. 2011); <u>Raiche v. Peitroski</u>, 623 F.3d 30, 40 (1st Cir. 2010); <u>Santoni v. Potter</u>, 369 F.3d 594, 603 (1st Cir. 2004).

    2.  <u>Claim against Sanbornton</u>

Sanbornton argues that it is statutorily immune from liability for McSweeney's battery under RSA 507-B:2 and 507-B:5. RSA 507-B:5 provides that "[n]o governmental unit shall be held liable in any action to recover for bodily injury, personal injury or property damage except as provided by this chapter or as is provided or may be provided by other statute."  RSA 507-B:2 provides that a municipality may be liable for negligence "arising out of ownership, occupation, maintenance or operation of all motor vehicles, and all premises . . . ."  Based on the interaction of those statutes, Sanbornton contends that it is immune from liability for McSweeney's battery.

Huckins does not dispute that if RSA 507-B:2 and 507-B:5 are constitutional, the interaction between statutes gives Sanbornton immunity for McSweeney's battery.  Huckins argues, however, that RSA 507-B:2 and 507-B:5 are unconstitutional because they preclude entire classes of tort victims from recovering in violation of Part I, Article 14 of the New Hampshire Constitution.

Although the New Hampshire Supreme Court has not addressed
the constitutionality of the current versions of RSA 507-B:2 or
507-B:5, that court has addressed the constitutionality of
municipal liability generally.  For example, in <u>Opinion of the
Justices</u>, 126 N.H. 554 (1985), the New Hampshire Supreme Court
rendered an advisory opinion on the issue of governmental
immunity in the context of proposed legislation addressing the
sovereign immunity of the State.  The court considered a proposed
provision granting immunity to the State from "[a]ny claim
arising out of the ownership, occupation, maintenance, or
operation of public sidewalks, streets, highways, or publicly
owned airport runways or taxiways."  <u>Id.</u> at 565.  In opining that
the provision was unconstitutional, the court noted that the
State's interest in minimizing its liability exposure could be
served by "retention of the State's immunity for injuries caused
in the exercise of a legislative, judicial, or planning function,
and for intentional torts based on a reasonable belief in the
lawfulness of the offensive act."  <u>Id.</u> at 565-66.  The court
further stated that "[i]f the legislature wishes to further
insulate the State from the consequences of its tortious conduct,
it must employ measures that do not purport to reduce the
substantive scope of the State's liability."  <u>Id.</u> at 566.

In <u>City of Dover v. Imperial Cas. & Indem. Co.</u>, 133 N.H. 109 (1990), the New Hampshire Supreme Court declared unconstitutional a former version of RSA 507-B:2 because it provided total immunity to municipalities in the ownership, occupation, maintenance or operation of public sidewalks, streets, and highways.  The court reasoned that blanket municipal immunity denied "parties injured on municipal highways and sidewalks a right to recover as provided in part I, article 14" of the New Hampshire Constitution.  <u>Id.</u> at 120.

When state law has been authoritatively interpreted by the state's highest court, this court must "apply that law according to its tenor."  <u>Kassel v. Gannet Co.</u>, 875 F.2d 935, 950 (1st Cir. 1989).  "But, this court is and should be hesitant to blaze new, previously unchartered state-law trails.  Accordingly, when a dispositive legal question is novel and the state's law in the area is unsettled, certification is often appropriate."  <u>Moore v. Rockwood</u>, 2010 WL 1417653, at *4 (D.N.H. Apr. 5, 2010).

Determining whether a New Hampshire statute conflicts with New Hampshire's Constitution, particularly when the statute in question implicates substantial public policy concerns, is an issue that should be decided by the New Hampshire Supreme Court. Therefore, the question of the constitutionality of RSA 507-B:2

and 507-B:5 cannot be resolved here and instead must be certified
to the New Hampshire Supreme Court.

C.   Malicious Prosecution

    In Huckins's opposition to the defendants' motion, he
asserts that he "intends to voluntarily dismiss Count III
(Malicious Prosecution) to simplify and streamline this
litigation."  He does not otherwise address the defendants'
arguments on that claim.  Accordingly, Sanbornton is entitled to
summary judgment with regard to the malicious prosecution claim.

Conclusion

    For the foregoing reasons, the defendants' motion for
summary judgment (doc. no. 9) is granted in part and denied in
part.  Summary judgment is granted on the plaintiff's § 1983
claim of unreasonable detention and on his malicious prosecution
claim.  Summary judgment is denied without prejudice as to the
plaintiff's claim for battery against the Town of Sanbornton
pending certification of a question to the New Hampshire Supreme
Court.  The motion is otherwise denied.

    The court proposes to certify the question of the
constitutionality of RSA 507-B:2 and 507-B:5 to the New Hampshire
Supreme Court.  The parties shall confer and submit a joint

filing with the proposed language for the question or questions to be certified **on or before Monday, August 27, 2012.**  The court proposes to submit to the Supreme Court, as its statement of facts, the facts as presented in this order.  If any party objects or wishes the court to supplement that statement of facts, that party shall submit an objection and/or proposed statement of supplemental facts by the same date.  See generally N.H. Supr. Ct. R. 34.


        SO ORDERED.


                                    _____
                                    Joseph A. DiClerico, Jr.
                                    United States District Judge

August 13, 2012

cc:   Charles P. Bauer, Esquire
      Samantha Dowd Elliott, Esquire
      Jason R.L. Major, Esquire

21